Good morning, Your Honor. Richard Schwartz on behalf of Appellant. I would like to address three primary points today. The first, the heightened standard of review. The second, no competent evidence of likelihood of irreparable harm. And third, that the district court erred in two of the digits of this sleep craft likelihood of confusion test. As to the first matter. Your Honor, counsel, before you begin, there's one thing I just want to clarify. As I understand the record here, the district court entered the injunction, but then stayed it, correct? Correct. So right now, in real terms, your client is still manufacturing the goods that are at issue in this case? That's correct. Okay. Thank you. Let me proceed. And for point of clarification, there was an injunctive order that was issued, we appealed, then this court remanded it back to the district court for reconsideration, and there was a second order. And the second, the reconsideration order was stayed. So as to the first point, first, this court should apply a heightened scrutiny standard of review for one of two reasons. The first is it grants the appellees substantially all the relief that is sought. Now, this is a point of first impression for the Ninth Circuit. Now, your sister circuit, the Tom Doherty case in the Second Circuit, has applied this rule. Now, several of the district courts in the Ninth Circuit have applied this rule. And this rule, as was explained by the Second Circuit, means that the effect of the order, once complied with, cannot be undone. So that once the enjoined party does what he's supposed to, if the enjoined party then wins at trial, that there's no effective remedy. And it's for that reason that a heightened standard of review should be the standard with which this court should review the injunction that was issued. What is the issue that is a first impression exactly? That is the substantially all the relief sought. And it's raised specifically and detailed in the reply at pages 9 and 10 with the various cases and the citations. The Eichol case, for example, which is a Ninth Circuit district court case, approvingly cited the Tom Doherty case, which is the Second Circuit case, as to this rule. When you say there would be no relief if the enjoined party ultimately won, do you mean your client would go bankrupt? No. What is the? Here's the situation. If the injunction were complied with, our client, Titanus Lightshot, would have to completely rebrand itself. It would have to change its name. It would have to change its letterhead, its advertising, its promotion, its filings with the Secretary of State, its marketing advertising. Or just stop selling this product for a little while. Well, the practicalities of it is there's no product involved. Each one of these lights that it manufactures, and there's a different series of lights, and each of these lights have their own trademark, or under the housemark, Titanus. That's like telling Ford that it can't use Ford, but it can sell its F-150 pickup. Or not. Or don't sell it for six months while the trial happens. To not sell it would mean to close down the business. Or they could call it Mercury. I mean, there are times when, you know, companies do market items under different brands. We do have different trademarks for each of the specific light products. But they're all the only product that the client provides are grow lamps. And so it has a series of different grow lamps. And each one of these grow lamps have different trademark names because they do different kinds of things. But the housemark under which all of them were sold is Titanus Lightshot. And it's for that reason that if we had to rebrand the entire company, that if on trial on the merits, Titanus Lightshot prevailed, it would then not be able to undo the mischief that the injunction had caused. The second reason for the standard of review should be heightened, is that this is a mandatory injunction. Although on its face it seems to be prohibitory, there is many courts have commented that these kinds of cases where an injunction facially is prohibitory is nonetheless is mandatory in effect. And it's for that reason this mandatory injunction should not have been granted because there was no extreme or very serious damage that will result. This injunction does not preserve the status quo. It alters it. And I suggest that you look at the Gladwell case, which is at the reply on pages 7 and 12. The status quo we're supposed to look at, though, is before the allegedly infringing products entered the market, right? Not the status quo right now. The infringing products. The appellee sells a controller that's used to control the honor. Basically, it's a switch. And that's used on grow lights or can be used in a variety of other things that are associated with horticulture. The products that our client sells are grow lights that they themselves have independent trademarks. And so you're arguing it's not actually infringing, but that doesn't answer the question of what point in time we look at to see where we count the status quo. Oh, I believe there is a period of a year and a half where the parties were contemporaneously in the marketplace competing with one another. And so if you look at the time before there was any activity between the plaintiff and the defendant or the appellee and the appellant in this case, you look at that period, and these are the periods where there was that establishes the status quo. I trust that's it. I don't understand that. Before your client entered into business? The appellee started selling their products under Titan control in 2008. In 2010, the appellant started selling its goods. In 2012, in May of 2012, that's when they said they first discovered that there was this problem. So the status quo is when? The status quo is as of the time they first discovered the problem. I don't think that's right. Why don't we move on? I don't think we agree with you about that. Judge Board Law, which I think says it beforehand. Counsel, why don't you also focus on the ‑‑ I'm particularly interested in the third issue in this case as it's laid out in the brief. So we've got the preparatory injunction question. We've got the sleek factors. There's also the demonstration of harm. Okay. I'd be happy to address that. So if you could spend some time on that. Yes, I will. In the view of the appellant, the appellees provided no competent evidence of likelihood of irreparable harm. All you see is attorney argument. The likelihood of irreparable harm is a mandatory element that the appellees had to prove to support the preliminary injunctive relief, as this was held in Judge Schrader's case in the flexible lifeline case. There's no longer a presumption of irreparable harm in a trademark case, even if the appellant is deemed to be infringing, as this Court ruled in the Herb Reed case. The single subject of irreparable harm was advanced in this case as what we call euphemistically the marijuana connection. And procedurally, the appellees did not raise this claim until their reply brief. So we had their motion in chief. We had the answer. And then in the reply, we have this attorney argument about this marijuana connection. And also the letter, right? And the letter. And the letter. And this letter is not authenticated. There's no declaration that goes with it. There's only attorney argument. The letter doesn't state who it was sent to, whether it was actually received, whether it was actually accepted. Did anybody ever agree to it? And on its face when you read the letter, it's ostensibly that we don't deal with these companies that have some marijuana connection because it's a violation of federal law. Is that the only copy of the letter, the one that's been referred to in the briefs, in the record? Correct. Is there a signed copy anywhere? No. Is there a list that you know of in the records saying here are the 100 people who got the letter? No. There's no affidavit, no declaration. It was simply an attachment to the reply brief. And, indeed, so you have the situation where we have the moving paperwork of the appellant, our answer to that, their reply, where they bring up this new topic, and that is never even addressed in the first court's preliminary injunctive order. Now, admittedly, there was supplemental briefing that was allowed after that topic was raised, but the issue of this kind of harm was never addressed in Judge Hick's first order. Let me ask you this. The court is entitled to look at all of the evidence that was before it with respect to confusion, the nature of the products, the markets that they're dealing with, all of that stuff, is it not? Absolutely. Absolutely. So the court then said, said in its order that the defendants contend that their reputation and goodwill. Well, see. Isn't that a finding of fact that we have to look to see is supported? Well, Your Honor, my read of that is that that's a reasonable argument. I mean, I'm not saying that the court is going to have to rely on the old presumption of irreparable harm as opposed to an actual showing evidence of irreparable harm, which Herbrey clearly requires. Well, the court expressly says in the preceding paragraph that there is no presumption of irreparable harm. I understand that, Your Honor, but there's no factual basis for that conclusion. I mean, the limited marketplace comment only comes in one place. There was a sua sponte question of the court during the oral argument where counsel said, I think there are only four major players in this marketplace, and that's the extent of it. There's no sworn testimony. There's no declaration. There's no affidavit. And this is the problem that continues to permeate the irreparable harm issue, that there's no competent evidence that supports this key factor, which now there must be a clear evidentiary showing. And particularly in this case, because this is a mandatory injunction, it must be under this heightened standard. But it doesn't have to be admissible evidence at this stage, right? But doesn't Erbreed in footnote 5 say that we can look at anything even if it's not admissible because P.I. proceedings are rushed? Well, I mean, I guess you could take a broad brush, but just anything that a lawyer propounds in an oral argument, can it be considered? Of course it can be considered. But the letter, the letter we could consider, right? Well, respectfully, no. It's not authenticated. There was clearly plenty of time for the appellant to have a declaration showing how it was used, how many people had seen it, how many people had signed it, how many people had responded to it. We might think it's not very persuasive for all those reasons. Exactly. But under footnote 5 in Erbreed, we could consider it, right? Well, again, in my judgment, no, because it's not competent evidence. And so the district court was wrong in considering it? We believe so, yes, Your Honor. And the district court didn't even consider any of this evidence on its initial order. It only considered it on reconsideration because there's no, there's no, there's no language in the initial injunctive decree that related to the irreparable harm showing, this marijuana connection, any comment as it related to the letter at all. Lastly, with respect to success on the merits, there's two quick points I'd like to make on the digits. One, that the Titan controls mark is weak. The district court, sua sponte, found that the descriptive mark, meaning Titan controls, means really great controls. They found that that descriptive mark had secondary meaning. This was a point it raised on its own. There was no point that was raised, the appellees made no point to that particular fact. Further, we believe it's important that the court consider the widespread use of this mark by third parties, citing the Streetwise case that's in the Second Circuit also. Here, when, on a search of the PTO records, when the case was originally started, there were some 1,500 plus sites. Checking this weekend, it's over 1,650 sites of different companies using Titan in their name. And this goes to the strength of the mark. Lastly, we think the court erred in finding that the marks were similar in two points. One, it failed to consider the federal registration that the appellants got on the mark Titanus, even in the face of the protest lodged by the appellees, that the federal registration for Titanus. And secondly, the court failed to take into account the commercial impression of the marks, that is, how the marks are actually used in commerce, that it's Titanus Light Shop with this light bulb loco versus Titan Controls and its stylized lettering as used with this Greek helmet that it uses. I just wanted to clarify that the paragraph that I just read to you was not from the reconsideration. It was from the original order. I'm sorry. You said that the court didn't discuss irreparable harm until the reconsideration. But the paragraph that I just read to you was from the original order where it did discuss irreparable harm. Well, it didn't represent ñ I mean, it did not, unless I'm mistaken, Your Honor, it did not address the marijuana connection, which is the only evidence. It didn't use the word marijuana. It didn't use ñ it didn't discuss any of that. It just euphemistically referred to irreparable harm, and that's the point. Okay. Thank you, Your Honor. Thank you, counsel. Good morning. My name is John Naylor, and I represent Sunlight Supply and IP Holdings. Before getting into the particular arguments or the particular points that were made by Titan S, I wanted to, first of all, stress to the court that this is a very straightforward, almost run-of-the-mill trademark case. My client, Sunlight Supply, started the Titan Controls mark in 2008. It marketed it separately. At this ñ by 2012, it had already 88 different products. It had sold about $5 million worth of product at that point in time, and that ñ the $5 million was comprised of about 136,000 sales of separate units. This is a very, very small market. Now, the counsel is correct, of course, in that the saying that there were only three or four dominant players, that is a comment that was made during the oral argument before the district court. However, the affidavits that we attach to our motion for summary judgment stress that Titan Controls is a market leader. Theyíre one of the big players in this particular market. Now, then, what happened was, in 2011, along came Titan S. Now, thereís ñ I recognize that there is a bit of a discrepancy in the record, or at least a factual dispute, because they said that they have been ñ theyíve been marketing under Titan S since 2010. However, the company itself was not formed in Nevada until the middle of 2011. And itís undisputed in the record that the first time that they actually start marketing anything, when my client first notices it, is in the middle of 2012, when they started advertising in the Maximum Yield magazine. Now, Maximum Yield is one of the major trade publications in this particular industry, and itís one of the few trade publications where you see all the major players. When you say this particular industry, what industry are you talking about? This is the ñ what I call the growth ñ the indoor growth industry. This particular industry is for people who want to grow plants in their house primarily for consuming them, like if you wanted herbs, spices, that sort of thing, or more exotic-type plants, African violets, that sort of stuff. But itís all people who want to actually grow this inside their home. Fruits and ñ well, probably not fruits, but vegetables would be another particular area. So thatís ñ thatís the market niche that Titan controls. But itís not greenhouses or ñ No, Your Honor. Itís not 50,000-square-foot greenhouses or these huge ñ I mean, our controllers, that could be used there, but thatís not specifically what weíre targeting. Now, what happened then in 2012 is that we started ñ brought it to Titan Sís ñ Titan Sís attention. Titan S, we go through this back and forth, trying to negotiate a ñ some sort of an agreement with them. However, all of a sudden, in November of 2012, they sue us. And so we then proceed with this motion for summary judgment, or rather, this motion for preliminary injunction. Now, the ñ this is sort of the only twist if ñ that makes this case a little bit different, if you will, than a traditional trademark case. We move for preliminary injunction to stop them from using the Titan S name. Now, what we stressed in the ñ in our motion, and what we stressed before the name of their corporation. All we would be asking for is that if they use a DBA, doing business as, or if they just do not brand any of their products Titan S. And in that way, in that sense, itís no different than any other preliminary injunction motion somebody would typically see in a trademark case. Now, when we first filed the motion, the law of the Ninth Circuit was that irreparable harm was presumed. And thatís what we argued in our opening brief, or argued in our moving papers, rather. And that was the state of the law. It took you three months to file the PI motion from the time that they filed suit. Why doesnít that delay undermine your claim of irreparable harm? Your Honor, youíre absolutely correct. We could have and probably should have moved faster. However, we were caught off guard. But also in the ñ this is a judgment call by the district court, which is what I would ñ which is what I would stress, and that itís an abuse of process standard and ñ or rather, an abuse of discretion standard and would give great deference to the district court judge. I would compare that with the Russell Road case, which was also heard by the same judge in the district court. In that case, the judge looked at the different factors and said, if Iím recalling them correctly, that delay was way too long and thatís going to be one of the reasons why Iím denying the motion for preliminary injunction. The district court here is intimately familiar with the ñ with this particular case and decided that, given all the discussions that had gone on and what we were trying to do in that case, Iím not going to hold that delay against them. And that decision and that judgment call by the district court should be respected here. But, counsel, let me fast-forward to a ñ on a follow-up question of what Judge Friedman was asking. Herbread, which is the change in law, stresses the need for evidence, not platitudes. Can you talk to us about what the evidence was before the district court that there was irreparable harm here? The evidence before ñ that was before the district court is effectively twofold. One is the letter, and let me speak to the letter for just a moment. When the ñ this issue of irreparable harm and evidence of irreparable harm was raised in the opposition, we therefore added this into the reply, and then they filed their motion to strike our reply for adding new material. That issue was fully briefed. The judge decided that it was not new material, however, gave them an opportunity to file a surreply, so to speak. And so the judge did have this ñ the marijuana issue in front of him, and the judge did consider it on the first go-round. But that letter is piece of evidence number one. Piece of evidence number two ñ Why is that letter not authenticated? With all candor to the court, Your Honor, it had to do with the fact that we felt that we had to raise it in a reply, and the judge ñ or the district court in Nevada had just come out with a ñ well, not just come out, but a similar case in which affidavits were added and so-called new evidence was added, and that was all stricken. And I'll be quite honest with the Court. I was the one who made that judgment call and decided that I didn't want to go that far, that we were just going to make that argument. It also had to do with the fact, Your Honor, that, again, at the time that that was in the Ninth Circuit at the time was that the irreparable harm would be ñ would be presumed if we were able to show a likelihood of success on the merits. Did you ever request leave from the court in the motion for reconsideration stance to supplement the record with something more than just the unsigned letter? No, we did not, Your Honor. There wasn't any reason you couldn't have done that, was there? You're correct, Your Honor. There was not ñ nothing preventing us from doing that. So you mentioned the letter.  You said there were two pieces. What was the other piece? The other piece was the discount hydroponics piece. And the discount hydroponics is a company that at the time was an online retailer to the general public for the types of products that you would buy if you wanted to grow plants and such in your home. And that discount, the Titan S, if I'm recalling the record correctly, was selling solely through discount hydroponics, or at the very least, that was one of their main distributors. And so what happened at that point in time was when you looked at discount hydroponics's website, it was heavily laden with what Titan S is referring to, the marijuana connection, and that it almost seemed that at that time discount hydroponics was aiming specifically at that particular market segment. So I'm really confused by this argument, because you are arguing that your client didn't market to people or stores who were going to sell marijuana. But then you're also arguing that discount hydroponics only marketed to people who were selling marijuana. So if those two groups don't overlap, I don't understand how you were going to have lose customer goodwill. Your customers supposedly weren't looking at marijuana sites. So it seems like they wouldn't even notice this on discount hydroponics. I don't understand the logic of your argument. The logic is, Your Honor, and it has to do with the fact that discount hydroponics, when you looked at their particular market segment, or what they were trying to do, is it appeared to us that they were marketing primarily to that particular market. Now, what they were also at the time trying to court us and have us sell our products, they are also ---- But you wouldn't have supposedly with this letter. So you wouldn't have, and supposedly your customers wouldn't look at such websites. So I just don't understand how the customers are going to be confused or how you're going to lose goodwill. Right. The fear would be, Your Honor, is that if we had one of our big customers out there looking out at the Internet trying to find particular products, and they pulled up the Titan S name and found it on the discount hydroponics website and said, ah, there must be a connection there, and then now I'm going to start, because of the confusion between the Titan S and the Titan Marks, my concern would be the customers out there into that particular market. And counsel, I understand the concern, but we're now Herb Reid. I certainly under the old standard, I think you may, okay, that makes a lot of sense. But now under Herb Reid or eBay or Winter, however you want to call this new standard, I think you need more than just a generalized concern. I could see why there would be the concern. Can you think of any cases in the Winter eBay era, so not just limited to trademark, but patents or copyrights, where there was equal to or less evidence than something like the letter and the screenshots from the website where a preliminary injunction was upheld on irreparable harm? I've looked for those kind of cases, Your Honor, but I was not able to find anything that specifically would employ what this circuit now uses called the Herb Reid standard in another circuit. When you think of a typical trademark case, as you talked about, normally you would have affidavit from an expert saying we talked to these customers, we talked to these stores, and people are saying we won't buy Titan stuff anymore because they're dealing with, you know, the potheads or something like that. I'm not seeing anything like that in this record. Well, but then, if I may, Your Honor, what you would expect to see then would be later on in the case for a motion for a permanent injunction, because by that point in time you would have an ability to develop the evidence and to go out there and conduct these sorts of studies. But now you're contesting Herb Reid, right? And we're bound by that as a panel. No, I'm not contesting Herb Reid, Your Honor. Herb Reid is what I'm trying to argue here is that at this preliminary stage of the proceedings where you've got a competitor out there who is using a very similar mark, and they are a new entrant to the marketplace, because remember, they started, as best we can tell, advertising in 2012, and there's no evidence in the record that they've had any sales whatsoever. So when moving for a preliminary injunction, the types of evidence that you would expect to see would be the letter, the discount hydroponics argument and such, because if we had to go out and then start conducting marketing studies that would try to market people with respect to a hypothetical product or hypothetical sales, the delay would be even longer and longer. But here we had three months at the beginning. We've had several years now since this all happened. I know it's been stayed during this time period, but it seems to me under Herb Reid you could have a store owner who sells these things or a customer service rep for your  And it seems to me that that's not the case. I mean, I'm not saying that tightness doesn't work and they think it's us or that they don't want to deal with marijuana holders. Anything like that in this record? Nothing like that in this record, Your Honor. However, that has been developed, but that will have to come later on because the briefing now is closed. Well, let me ask you this, counsel. If we were to remand this case to the district court, there's a stay in place right now, so the status quo has not changed as I understand it. If this case is remanded to the district court to make either further findings and factual findings as to the harm under Herb Reid or it goes to a preliminary injunction, what would be the injury to your company if that's what we end up doing? What would be the evidence of the injury? The evidence of the injury? Well, then we could go get we could demonstrate to the district court that we now have and things have happened. I mean, to be quite forward about it, Your Honor, discount hydroponics, since this briefing cycle has been completed, is, as I understand it now, no longer selling tightness products. They've taken all that material down, they've signed our letter, and we are going to start selling through them. And that, to me, would basically would support our argument that our goodwill is quite important to us. We don't want to be selling through companies that are primarily marketing or at least perceived to be primarily marketing marijuana. And they agree with us and they've changed our policies, and so now we're moving forward. Have they taken down their marijuana ads? When I last looked at the website, the last time they've taken down all the pictures and the stash jar and such that appears in the record, the only thing that's left appear to be they're selling one or two T-shirts in one of their clearance centers, probably to get rid of the rest of the stock. So that sounds like evidence that you succeeded in using this letter. But I'm not sure it shows evidence that you were harmed. The standard, Your Honor, is we briefed it as the likelihood of harm. And Herbreed talks to damage to goodwill or potential damage to goodwill as being the irreparable harm. And here we've been able to, I believe that we've been able to demonstrate that through this issue with marijuana. Has there been ever any evidence submitted that there was actual confusion or any lack of goodwill, any customers withdrew because they were confused by this product? No, Your Honor. That's it. All right. Thank you very much for your argument, counsel. Thank you, Your Honor. The matter is submitted.
judges: SCHROEDER, OWENS, FRIEDLAND